**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **JENNIFER L. M.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 20 C 338** |
| | ) | |
| **KILOLO KIJAKAZI, Acting** | ) | **Magistrate Judge Finnegan** |
| **Commissioner of Social Security,[1]** | ) | |
| | ) | |
| **Defendant.** | ) | |

## ORDER

Plaintiff Jennifer L. M. seeks to overturn the final decision of the Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act. The parties consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and Plaintiff filed a brief explaining why the Commissioner's decision should be reversed or the case remanded. The Commissioner responded with a competing motion for summary judgment in support of affirming the decision. After careful review of the record and the parties' respective arguments, the Court affirms the ALJ's decision.

## BACKGROUND

Plaintiff applied for DIB on February 21, 2017, alleging disability since December 23, 2011 due to a Chiari malformation,[2] degenerative disc disease of the cervical and

---

[1]      Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. She is automatically substituted as the named defendant pursuant to FED. R. CIV. P. 25(d).

[2]      A Chiari malformation is a "condition in which brain tissue extends into the spinal canal." (https://www.mayoclinic.org/diseases-conditions/chiari-malformation/symptoms-causes/syc-20354010, last visited February 8, 2022). Symptoms can include neck pain, unsteady gait, poor hand coordination, dizziness, and numbness and tingling of the hands and feet. (*Id.*).

lumbar spine, peripheral neuropathy, high blood pressure, depression, and anxiety. (R. 174, 214). Born in February 1976, Plaintiff was 35 years old as of the alleged disability onset date, and 44 years old as of the December 31, 2020 date last insured, making her at all times a younger person. (R. 174, 210); 20 C.F.R. § 404.1563(c). She completed two years of college (R. 48, 215) and lives alone in a house with five dogs that "cannot be adopted." (R. 46-47, 49). Plaintiff worked as a fund control manager from January 2000 through December 2001, and served as a mortgage loan officer from January 2004 through December 2005. (R. 216). From January 2008 to the present, she has been the executive director of Habitat for Hounds, her parents' non-profit dog rescue organization, but the job does not constitute substantial gainful activity. (R. 17, 48, 216).

The Social Security Administration denied Plaintiff's applications initially on April 13, 2017, and again upon reconsideration on September 11, 2017. (R. 83-106). Plaintiff filed a timely request for a hearing and appeared before administrative law judge Cynthia M. Bretthauer (the "ALJ") on December 4, 2018. (R. 39). The ALJ heard testimony from Plaintiff, who was represented by counsel, from vocational expert ("VE") Richard T. Fisher, and from Plaintiff's mother. (R. 39-82, 277). On February 6, 2019, the ALJ found that Plaintiff's Chiari malformation; cervical spine and lumbar spine degenerative disc disease, status post surgeries; headaches; and neuropathy are severe impairments, but that they do not meet or equal any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 17-21).

After reviewing the evidence in detail, the ALJ concluded that Plaintiff has the residual functional capacity ("RFC") to perform light work involving: occasional stooping, crawling, crouching, kneeling, and climbing of stairs and ramps; no climbing of ladders,

ropes, and scaffolds; and performance of simple and detailed 1-5 step instructions due to decreased concentration from allegations of pain and possible medication side effects. (R. 21-31). The ALJ accepted the VE's testimony that a person with Plaintiff's background and this RFC can perform a significant number of light jobs available in the national economy, and so found Plaintiff not disabled. (R. 32). The Appeals Council denied Plaintiff's request for review (R. 1-6), leaving the ALJ's decision as the final decision of the Commissioner and, therefore, reviewable by this Court under 42 U.S.C. § 405(g). *See Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005).

In support of her request for reversal or remand, Plaintiff argues that the ALJ: (1) erred in weighing the opinion from her treating orthopedist, Charles M. Slack, M.D.; (2) made a flawed physical RFC determination; (3) failed to properly account for her moderate limitations in concentration, persistence, or pace; (4) erred in discounting evidence regarding the limiting effects of her headaches; and (5) did not fairly assess her subjective statements regarding her symptoms. For reasons discussed in this opinion, the Court finds that the ALJ's decision is supported by substantial evidence.

## DISCUSSION

### A.    Standard of Review

Judicial review of the Commissioner's final decision is authorized by 42 U.S.C. § 405(g) of the Social Security Act (the "SSA"). In reviewing this decision, the court may not engage in its own analysis of whether Plaintiff is severely impaired as defined by the Social Security regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Nor may it "'displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations.'" *Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010) (quoting

*Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007)).  The court "will reverse an ALJ's determination only when it is not supported by substantial evidence, meaning 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Pepper v. Colvin*, 712 F.3d 351, 361-62 (7th Cir. 2013) (quoting *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011)).

In making its determination, the court must "look to whether the ALJ built an 'accurate and logical bridge' from the evidence to [his] conclusion that the claimant is not disabled."  *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009) (quoting *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008)).  The ALJ need not, however, "'provide a complete written evaluation of every piece of testimony and evidence.'"  *Pepper*, 712 F.3d at 362 (quoting *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (internal citations and quotation marks omitted)).  Where the Commissioner's decision "'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required."  *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009) (quoting *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002)).

## B.    Five-Step Inquiry

To recover disability benefits under the SSA, a claimant must establish that she is disabled within the meaning of the SSA.  *Snedden v. Colvin*, No. 14 C 9038, 2016 WL 792301, at *6 (N.D. Ill. Feb. 29, 2016).  A claimant is disabled if she is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to law for a continuous period of not less than 12 months."  20 C.F.R. § 404.1505(a).  In determining whether a claimant suffers from a disability, an ALJ must

conduct a standard five-step inquiry, which involves analyzing: "(1) whether the claimant is currently employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling; (4) if the claimant does not have a conclusively disabling impairment, whether [s]he can perform her past relevant work; and (5) whether the claimant is capable of performing any work in the national economy."  *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012) (citing 20 C.F.R. § 404.1520).  If the claimant meets her burden of proof at steps one through four, the burden shifts to the Commissioner at step five.  *Moore v. Astrue*, 851 F. Supp. 2d 1131, 1139-40 (N.D. Ill. 2012).

**C.    Analysis**

   **1.    Opinion Evidence**

   Plaintiff argues that the case must be reversed or remanded because the ALJ erred in giving only little weight to the opinion from her treating orthopedist, Dr. Charles M. Slack.  A treating source opinion is entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record.  20 C.F.R. § 404.1527(c)(2); see *Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011); *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010).  If the opinion is contradicted by other evidence or is internally inconsistent, the ALJ may discount it so long as she provides an adequate explanation for doing so.  *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011); *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010); *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007).  That is to say, the ALJ must offer "good reasons" for discounting a treating physician's opinion, *Scott*, 647 F.3d at 739, and then determine what weight to give it

considering (1) the length of the treatment relationship and frequency of examination, (2) the nature and extent of the treatment relationship, (3) the degree to which the opinion is supported by medical signs and laboratory findings, (4) the consistency of the opinion with the record as a whole, (5) whether the opinion was from a specialist, and (6) other factors brought to the attention of the ALJ. 20 C.F.R. § 404.1527(c)(2)-(6); see *Simila*, 573 F.3d at 515.

On July 28, 2016, Dr. Slack completed a Lumbar and Cervical Spine Residual Functional Capacity Questionnaire indicating that Plaintiff has severe limitations caused by cervical and lumbar degenerative disc disease with radiculopathy, Chiari malformation, and chronic pain syndrome. (R. 311-15). Her symptoms include difficulty with balance when walking even short distances, short term memory loss, daily neck and low back pain, difficulty sleeping, hyperreflexive extremities (overactive reflexes with twitching or spastic tendencies), reduced range of motion, abnormal gait, reflex changes, tenderness, muscle weakness, sensory changes, lack of coordination, motor loss, problems with dropping things, and reduced grip strength. (R. 311-12). According to Dr. Slack, Plaintiff cannot walk more than a very short distance without rest or severe pain; can only sit for 10-15 minutes before needing to get up; can only stand for 5 minutes before needing to sit down or walk around; and can sit, stand, and walk for less than 2 hours total in an 8-hour workday. (R. 313). Plaintiff must walk around every 15 minutes for 10 minutes, and she must be able to shift positions at will. (R. 313-14). In addition, she frequently needs unscheduled 10-15 minute breaks, and she must elevate her legs on a small footrest when seated for a long time. (R. 314). Plaintiff can never lift and carry any weight at all; never twist, bend, crouch, or climb ladders/stairs; and never grasp, reach or perform fine

manipulations of any kind.  (R. 314-15).  Dr. Slack opined that Plaintiff's days are "mostly bad," she would likely be absent from work more than 4 days per month, and pain would constantly interfere with her ability to concentrate and maintain the attention necessary to perform even simple work tasks.  (R. 313, 315).

In giving this opinion little weight, the ALJ first found it unsupported by the medical evidence of record.  (R. 31).  The Court finds no error in this assessment.  Years before the December 23, 2011 alleged disability onset date, Plaintiff was diagnosed with fibromyalgia and chronic pain.  The conditions were largely stable through 2009, with Plaintiff working regularly and doing well.  (R. 338, 339-42).  On March 26, 2010, Plaintiff started seeing rheumatologist Lori B. Siegel, M.D.  Plaintiff was "functioning fairly well" and though she had some trigger points in the knees and hands, these were not "classic" tender points.  (R. 323).  At a follow-up appointment on May 7, 2010, Dr. Siegel expressed concern that Plaintiff was "malingering."  (R. 309).  A May 17, 2010 MRI of the cervical spine showed degenerative changes and moderate stenosis at C5-C6, (R. 302), and a June 25, 2010 MRI of the lumbar spine showed mild degenerative changes at L3-L4, L4-L5, and L5-S1.  (R. 303).

In March 2011, Plaintiff underwent an extensive evaluation at the Mayo Clinic and was examined by a neurologist, rheumatologist, and internist.  The final diagnoses included fibromyalgia, indeterminate paresthesias (abnormal sensation such as tingling or pricking), mild degenerative changes of the cervical and lumbar spine, and intractable headaches.  (R. 26, 369).  The consulting internist expressed concern about Plaintiff's "extensive polypharmacy" and opined that "many of her tremors, various indeterminate limb pains, and paresthesias may be related to medication side effects."  (R. 26, 372).  A

couple months later, on May 26, 2011, Plaintiff had another neurology consultation after telling her internist Gerald M. Farby, M.D., that she had suffered a seizure.  Karen K. Lin, M.D., noted that it was unclear whether the "spell" was actually a seizure since it was unwitnessed, and recommended that Plaintiff undergo a 24-hour EEG and return for further evaluation.  (R. 26, 532-33).  There is no evidence Plaintiff followed this advice.

Plaintiff next saw Dr. Siegel on June 10, 2011, primarily to advise the doctor about the seizure.  (R. 421).  Dr. Siegel noted that Plaintiff's "presentation is confusing because she sometimes acts like 'drug seeking' but can't tolerate many pain meds."  (R. 26, 420).  Except for some tenderness in the wrists, Plaintiff's physical exam was normal with full range of motion in the arms, legs, neck, and back.  (R. 421).  A June 11, 2011 MRI of the brain and a July 5, 2011 MRA of the head (ordered due to the seizure) were both largely normal, though there was a possible small vascular malformation.  (R. 330, 332, 396).

At a follow-up exam with Dr. Siegel on August 19, 2011, Plaintiff once again had normal joints and full range of motion in the arms and legs despite some wrist tenderness, as well as full range of motion in the neck.  Her legs and neck were both stable with good muscle tone.  (R. 26, 419).  On October 21, 2011, however, Plaintiff presented to Dr. Siegel in a great deal of pain.  She said she was unable to function, was newly experiencing neuropathy in one or both feet and an associated loss of balance, and she felt dizzy and disoriented at times.  Plaintiff also complained of "strange numbness," chronic headaches, and poor sleep.  (R. 559).  Dr. Siegel noted that radiographs showed "only mild osteoarthritis of the lumbar and cervical spine" (R. 558), and assessed fibromyalgia/generalized pain and headaches.  (R. 559).  Curiously, that same day Dr.

Siegel wrote a letter to the Illinois Department of Human Services stating that Plaintiff had been diagnosed with severe (not mild) osteoarthritis. (R. 367).

On November 15, 2011, internist Scott A. Kale, M.D., examined Plaintiff and determined that her symptoms of pain; dizziness, numbness and tingling in the hands when bending over; reduced range of motion in the cervical spine; limited toe and heel walking; and poor balance were all due to a Chiari malformation. (R. 27, 413). Dr. Kale notified Dr. Siegel of this finding. When Dr. Siegel next examined Plaintiff on November 22, 2011, she found no evidence of inflammation but agreed that Plaintiff's hands felt very stiff. (R. 557). Dr. Siegel prescribed piroxicam to help with the pain and instructed Plaintiff to follow up after seeing the neurosurgeon Dan S. Heffez, M.D. (*Id.*). The appointment with Dr. Heffez took place on December 21, 2011, one day after a brain MRI confirmed the existence of the Chiari malformation. (R. 443-44). Dr. Heffez determined that Plaintiff had congenital cervical stenosis (meaning she was born with a small spinal canal) with some superimposed mild disc degeneration and some definite distortion and flattening of the spinal cord, but no canal stenosis. (R. 406). Plaintiff also demonstrated "a very significant cervical myelopathy [spinal cord compression] with evidence of extreme hyperreflexia, Hoffman sign, spread of reflexes, inversion of the periosteal reflex, and impaired Romberg testing." (R. 27, 407). Dr. Heffez indicated that a number of these symptoms could be explained by the Chiari malformation and/or cervical spinal stenosis, and he recommended cervical laminoplasty to relieve compression of the spinal cord. (*Id.*). Plaintiff alleges that she became disabled two days after this exam, on December 23, 2011.

Dr. Heffez performed the cervical laminoplasty on February 15, 2012. (R. 23, 440). By May 30, 2012, Plaintiff's symptoms had not improved so Dr. Heffez performed a suboccipital craniectomy and partial C1 laminectomy on August 13, 2012. (R. 23, 433, 436). Shortly thereafter on September 1, 2012, Plaintiff went to the St. Francis Hospital with complaints of increased headaches. (R. 23, 616). Neurologist Prasad Chappidi, M.D., noted that Plaintiff's neck was supple without rigidity; Babinski sign was negative; and she had normal motor function, sensation, gait, station, and finger to nose test. (R. 23, 617). CT scans of the head and neck taken that day were largely normal (R. 334, 335), and Dr. Chappidi noted that Plaintiff was "a poor historian regarding frequency of headaches." (R. 23, 621). Plaintiff declined a recommended lumbar puncture and signed out against medical advice. (*Id*.). Three days later, on September 4, 2012, Plaintiff saw Dr. Farby with complaints of worsening headaches for the previous two days, plus fever and body ache. (R. 611). On exam, Plaintiff had some neck tenderness on flexion, but full motor strength of 5/5 throughout, normal deep tendon reflexes of 2+ in both biceps, and intact sensation. (R. 612). A September 27, 2012 MRI of the brain showed developmental venous anomaly or venous angioma (congenital malformation of veins) but no evidence of acute infarct or mass. (R. 23, 356).

Plaintiff returned to Dr. Farby on December 13, 2012 after experiencing an extreme increase in neck pain and muscle spasms over the previous 2-3 days. She was under a lot of stress because she was moving to a new home and trying to care for multiple dogs in her animal rescue shelter. On exam, Plaintiff had palpable spasm in the left posterior neck. (R. 24, 609). Dr. Farby assessed neck spasm, told Plaintiff to take Zanaflex (a muscle relaxant) at night to avoid sedation, and sent her for an MRI of the cervical spine

to rule out new disc herniation. (R. 610). That December 18, 2012 test showed no evidence of significant spinal stenosis or neural foraminal narrowing. (R. 336).

On July 19, 2013, Plaintiff saw Dr. Farby for an endometriosis flare. She complained of having seizures but refused to go to the hospital due to a "morbid fear" of them. (R. 23, 607). Plaintiff also reported continued fatigue, myalgias, neck pain and stiffness, dizziness, and weakness, along with sleep disturbance and decreased concentration. (*Id.*). On exam, Dr. Farby observed neck tenderness with decreased range of motion; decreased range of motion in the cervical back with tenderness, pain, and spasm; and abnormal gait. He assessed "suspect temporal lobe seizures," endometriosis, and fibromyalgia, and referred Plaintiff for another neurology consultation. (R. 608). There is no evidence that Plaintiff saw a neurologist but she did start treating with gynecologist Frank Tu, M.D., regarding her endometriosis and pelvic pain. (R. 638, 458). Plaintiff indicated on August 27, 2013 that she was interested in a total hysterectomy. (R. 24, 464).

The following week, on September 4, 2013, Plaintiff saw Dr. Farby after falling on a staircase in her home, causing spasm and decreased range of motion in the spine. (R. 24, 603). Plaintiff appeared uncomfortable and in pain during an exam, with tenderness in the right hip but no pain; decreased range of motion and spasm in the neck but no pain; and decreased range of motion, tenderness, pain, and spasm in the lumbar back. (R. 24, 604). Dr. Farby ordered more x-rays and put Plaintiff on Skelaxin (a muscle relaxant). (*Id.*). It does not appear that Plaintiff went for the x-rays but she returned to Dr. Farby five months later on February 3, 2014 to get clearance for a February 17, 2014 hysterectomy. (R. 599). Plaintiff exhibited full passive range of motion in the neck without pain and had

no neurological deficit. (R. 24, 600). For reasons unknown, Plaintiff canceled the hysterectomy procedure and never returned to Dr. Tu after February 2014. (R. 465).

Plaintiff had another MRI of the lumbar spine on July 3, 2014 that showed degenerative changes most prominent at L5-S1. There was also small focal disc protrusion towards the left but no stenosis. (R. 24, 357-58). On August 4, 2014, Plaintiff started seeing Dr. Slack. In a letter to Dr. Farby, Dr. Slack indicated that Plaintiff had been a patient "many years ago" and as of the end of June 2014 had developed severe radiating left lower back pain down to the bottom of the foot with numbness and tingling in the leg and toes. (R. 25, 539). An exam showed that Plaintiff was in some distress with her pain. A seated straight leg raise test was negative on the right but positive on the left. A straight leg test conducted while lying down was positive on both sides. Plaintiff exhibited brisk reflexes of 3+ in the ankles and knees but she had full muscle strength on the right and only slightly decreased strength of 4/5 in the left hamstring. Faber tests were negative aside from some decreased sensation to light touch in the left leg. (R. 25, 540). Dr. Slack diagnosed persistent left lumbar radiculopathy with a left-sided L4-S1 disc herniation and prescribed Norco. He also recommended that Plaintiff have a transforaminal epidural steroid injection but there is no evidence she did so. (R. 540, 552).

At a follow-up exam with Dr. Slack on September 3, 2014, Plaintiff complained of neck pain and intermittent numbness in her fingertips, as well as headaches that radiated up over her neck. Dr. Slack noted that Plaintiff walked with a slow and deliberate gait pattern but she had intact muscle strength and reflexes in the arms. Straight leg raise tests were once again positive on both sides, ankle reflexes were absent, and knee

reflexes were low (1+), but Plaintiff's muscle strength was intact on the right and only somewhat decreased on the left (5-).  (R. 542).  Dr. Slack referred Plaintiff to a pain specialist and gave her another referral for a lumbar epidural steroid injection.  (R. 553). Plaintiff ignored both referrals, but she did have another MRI of the cervical spine on October 17, 2014, which showed spondylosis at C3-C6 and a 2mm posterior central protrusion at C6-C7.  (R. 389-90).

On November 24, 2014, Plaintiff returned to see rheumatologist Dr. Siegel for the first time in more than 3 years (the last visit was on October 21, 2011).  (R. 544).  Plaintiff reported pain at a level of 7/10 in her whole body with associated fatigue and generalized numbness and tingling.  On exam, Plaintiff was not in any distress, she had full range of motion in her neck, and Dr. Siegel observed no costovertebral angle tenderness in the back, no scoliosis, and no kyphosis.  Though there was moderate paraspinal tenderness in the cervical, thoracic and lumbar areas, Dr. Siegel did not believe Plaintiff had an active connective tissue disease at that time.  (R. 25, 544).  This was Plaintiff's last appointment with Dr. Siegel.

Plaintiff had a follow-up exam with Dr. Slack on January 7, 2015.  Her muscle strength in the arms remained intact though she was somewhat hyperreflexive with positive Hoffman signs.  A seated straight leg raise test on the right caused some thigh pulling but the test was negative on the left and Plaintiff had intact muscle strength.  (R. 25, 547).  Based on the October 2014 MRI of the cervical spine, Dr. Slack assessed degenerative cervical disc disease and lumbar derangement with left-sided L4-L5 foraminal disc protrusion and L5-S1 left-sided protrusion.  He instructed Plaintiff to consult with a neurosurgeon but she never did.  (R. 25, 547).  At an appointment with Dr. Farby

two days later on January 9, 2015, Plaintiff had decreased range of motion in the cervical back, along with tenderness, pain, and spasm. (R. 594). Dr. Farby told Plaintiff to continue her current medication regimen, which included frovatriptan and topiramate (for headaches), gabapentin (for seizures), and the pain medications hydrocodone-acetaminophen, lidocaine, metaxalone, and duloxetine. (R. 595).

A year and a half later, in July 2016, Dr. Slack completed his opinion regarding Plaintiff's functioning. For some reason, the report is dated July 28, 2016, the day before Dr. Slack actually examined Plaintiff on July 29, 2016. In any event, Plaintiff complained of ongoing neck pain on a daily basis, lower back ache and stiffness with bilateral radiating leg pain, and pins and needles sensation and numbness in the lower extremities. Plaintiff conceded that she had not seen any neurosurgeon since her Chiari malformation surgery in August 2012 but said the pain in her neck and lower back ranged from a level of 3/10 to 8-9/10. She reported continuing "symptoms with any sustained activities, standing, walking, and bending," and complained of "difficulty with memory loss or short-term memory." (R. 25-26, 550). On exam, Plaintiff had limited neck flexion to 20 degrees; limited right and left rotation to 15 degrees; and slightly decreased upper extremity muscle strength of 4/5, including biceps, triceps and grip strength. (*Id*.). She was hyperreflexive in the upper extremities with bilateral positive Hoffman signs, and she experienced pain with internal and external rotation of the right shoulder. (R. 550-51). Dr. Slack observed that Plaintiff had an unsteady gait and was unable to toe and heel stand due to balance issues, but she had muscle strength of 5- in both legs. (R. 551). Forward flexion to 40 degrees caused lower back pain, as did minimal extension and seated straight leg raise

on each side. (*Id*.). Dr. Slack once again recommended that Plaintiff see a neurosurgeon, as well as a shoulder specialist. (R. 25, 551, 555).

Instead, Plaintiff waited nearly two years, until April 20, 2018 before receiving any further treatment. On that day she saw Dr. Farby for the first time in over three years (the last visit was on January 9, 2015). (R. 28, 589). On exam, Plaintiff exhibited spinous process tenderness and muscular tenderness in the neck, along with decreased range of motion. She also had tenderness and pain in the cervical back, thoracic back and lumbar back. (R. 590). Dr. Farby continued Plaintiff on her current medications and instructed her to return in 3 months. (R. 592). This is the last treatment note in the record.

Plaintiff ignores many of these objective findings and argues that Dr. Slack's own observations are sufficient to support the extreme limitations he imposed. (Doc. 15, at 5; Doc. 26, at 10). The Court disagrees. During the July 29, 2016 exam, Plaintiff exhibited limited range of motion in her neck, pain in the right shoulder with motion, unsteady gait, and hyperreflexia in the upper extremities. (R. 550-51). At the same time, Plaintiff had only slightly decreased muscle strength of 4/5 in both arms, including biceps, triceps, and grip strength, as well as nearly full muscle strength of 5- in her legs. (*Id*.). None of these records demonstrates that Plaintiff is completely unable to lift and carry any weight at all, can only sit for 10-15 minutes and stand for 5 minutes at a time, must elevate her legs when seated, and can never grasp, reach, or perform fine manipulations as set forth in Dr. Slack's opinion. Indeed, Plaintiff herself testified that she can perform personal care independently and do light cleaning and some laundry. (R. 57-58). Plaintiff insists that her testimony is not inconsistent with Dr. Slack's opinion since he was considering her functional ability in a competitive work setting and movement was painful for her. (Doc.

26, at 7, 8). But Dr. Slack's opinion is so extreme (essentially stating that Plaintiff can never even pick up a pencil), that the particular context does not provide a meaningful distinction.

Notably, Dr. Slack had seen Plaintiff on three prior occasions, August 4, 2014, September 3, 2014, and January 7, 2015, and documented very similar objective findings. (R. 539-40, 542, 547). Yet Plaintiff not only declined Dr. Slack's repeated recommendations for epidural steroid injections, she also went a year and a half until July 2016 without seeing him or any other physicians for further treatment. After the July 2016 appointment, moreover, Plaintiff never saw Dr. Slack (or any other orthopedist) again. In fact, she received no medical care of any kind for two more years until April 20, 2018, when she saw her internist Dr. Farby for the first time in three years. Dr. Farby simply instructed Plaintiff to continue with her same medication regimen. (R. 589, 592).

Contrary to Plaintiff's assertion, these records do not reflect mere "moments of normalcy" in between persistent episodes of disabling symptoms (Doc. 26, at 9, 10), but demonstrate that Plaintiff was able to go long stretches without medical treatment or intervention. (R. 28). And though Plaintiff did undergo two brain surgeries in 2012, her subsequent treatment over the next six years was largely conservative in nature, consisting of sporadic medical appointments and medication management, but no epidural steroid injections or lumbar punctures as her doctors recommended. *Cf. Carradine v. Barnhart*, 360 F.3d 751, 755 (7th Cir. 2004) (suggesting that implantation of a catheter and spinal-cord stimulator to control pain are not conservative treatments). In such circumstances, the ALJ did not err in rejecting Dr. Slack's conclusion that Plaintiff can barely sit, stand, or walk, and has no use of her hands. (R. 31) (noting that if Dr.

Slack's restrictions were accepted, Plaintiff "should be bed-ridden or at least require extensive rehabilitation or aggressive forms of treatment.").

Plaintiff argues that Dr. Slack's opinion is still entitled to greater weight because it is consistent with the other medical opinions of record. (Doc. 15, at 5-6; Doc. 26, at 11). It is true that on August 21, 2012, Dr. Heffez indicated in a treatment note that Plaintiff needed to "continue with activity restrictions of lying down flat for 30 minutes for every 1-2 hours she is up sitting or standing." (R. 365). But the ALJ reasonably afforded that assessment little weight because it reflected Plaintiff's functioning just two weeks after her brain surgery with no indication as to how long the restrictions needed to be in place. (R. 31). Notably, Plaintiff never saw Dr. Heffez again after that appointment so he could not provide insight into her functioning after August 2012, a period when she was able to go for years at a time without receiving any treatment.

The ALJ also gave little weight to Dr. Siegel's October 21, 2011 opinion that Plaintiff has severe osteoarthritis and cannot sit, stand, and walk for more than five minutes at a time, and cannot lift and carry items or perform small movements with her hands. (R. 367). As the ALJ explained, the finding of severe osteoarthritis conflicted with Dr. Siegel's note to Dr. Farby the same day stating that radiographs showed "only mild osteoarthritis of the lumbar and cervical spine." (R. 30, 558). In addition, Dr. Siegel provided her opinion before Plaintiff had surgery in 2012. (R. 30). Plaintiff does not challenge this finding or argue that Dr. Siegel's opinion was entitled to greater weight. This may be in part because after Dr. Siegel provided her assessment, Plaintiff did not see her again for more than three years until November 24, 2014, at which point Plaintiff had some moderate paraspinal tenderness but full neck range of motion, no

costovertebral angle tenderness in her back, and no scoliosis or kyphosis. (R. 544). And Plaintiff never returned to Dr. Siegel or any other rheumatology specialist after that date.

The other medical evidence Plaintiff cites mostly pre-dates the December 23, 2011 alleged disability onset date, or pre-dates her Chiari malformation surgeries in February and August 2012. (Doc. 15, at 5-7). For example, she notes that: she was diagnosed with fibromyalgia, chronic pain, and headaches in 2009 (R. 338, 340, 342); a May 17, 2010 MRI showed areas of degenerative disc disease (R. 326-27); Dr. Siegel diagnosed chronic pain syndrome in July 2010; Dr. Siegel diagnosed unspecified inflammatory polyarthropathy, disc disorder in the lumbar region, and generalized pain in June 2011 (R. 420); Dr. Siegel and Dr. Kale diagnosed Chiari malformation in October and November 2011 (R. 367, 413-14, 557); and on December 21, 2011, Dr. Heffez diagnosed a Chiari malformation, congenital cervical stenosis, definitive cervical myelopathy, and some degenerative changes but no canal stenosis, leading him to recommend surgical intervention. (R. 406, 440). These diagnoses and imaging results provide no insight into Plaintiff's actual functioning and so do not bolster Dr. Slack's opinion. *Kenneth A. v. Comm'r of Soc. Sec.*, No. 4:18-CV-04131-JEH, 2019 WL 7546617, at *9 (C.D. Ill. Sept. 20, 2019) ("[A] diagnosis alone is not enough to establish disabling limitations."); *Stanley v. Astrue*, No. 1:11-CV-00248, 2012 WL 1158630, at *8 n.8 (N.D. Ind. Apr. 6, 2012) ("[T]he diagnosis of an impairment does not alone establish its severity and its resulting limitations."). The same is true of the December 18, 2012 MRI of the cervical spine, which actually showed no evidence of significant spinal stenosis or neural foraminal narrowing (R. 336), and the October 17, 2014 MRI of the cervical spine showing spondylosis and a 2mm posterior central protrusion at C6-C7. (R. 389-90).

18

Plaintiff finally objects that the ALJ should have given more weight to Dr. Slack's opinion because he was a treating orthopedic specialist. (Doc. 15, at 4; Doc. 26, at 10). The ALJ expressly acknowledged Dr. Slack's specialty and discussed the four times he examined Plaintiff between August 2014 and July 2016. (R. 28, 30-31). For reasons stated, however, the ALJ reasonably discounted Dr. Slack's opinion given its inconsistency with other record evidence and the many years Plaintiff went without pursuing medical treatment despite purportedly being unable to lift and carry anything at all or to sit, stand, and walk for more than 5 to 15 minutes.

Viewing the record as a whole, the ALJ did not err in giving little weight to Dr. Slack's opinion. Plaintiff's request to remand the case for further consideration of this issue is denied.

### 2. Physical RFC

Plaintiff next argues the case must be reversed or remanded because the ALJ erred in finding that she has the RFC for light work. A claimant's RFC is the maximum work that she can perform despite any limitations. *See* 20 C.F.R. § 404.1545(a)(1); SSR 96-8p, at *1-2. "Although the responsibility for the RFC assessment belongs to the ALJ, not a physician, an ALJ cannot construct his own RFC finding without a proper medical ground and must explain how he has reached his conclusions." *Amey v. Astrue*, No. 09 C 2712, 2012 WL 366522, at *13 (N.D. Ill. Feb. 2, 2012).

The ALJ found that Plaintiff has the physical ability to engage in light work "as defined in 404.1567(b)" involving: occasional stooping, crawling, crouching, kneeling, and climbing of stairs and ramps; and no climbing of ladders, ropes, and scaffolds. (R. 21). Plaintiff first says this RFC is flawed because the ALJ failed to explain what she

meant by light work and did not articulate exactly how much sitting, standing, walking, lifting, and carrying Plaintiff can perform.  (Doc. 15, at 7-8; Doc. 26, at 3).  In making this argument, Plaintiff ignores the well-established precedent that light work involves occasionally lifting and carrying 20 pounds, frequently lifting and carrying 10 pounds, standing and walking for about 6 hours in an 8-hour workday, and sitting for about 2 hours in an 8-hour workday.  20 C.F.R. § 404.1567(b); SSR 83-10, at *5-6.

Plaintiff argues the RFC remains deficient because it is not based on record evidence.  As discussed earlier, the ALJ reasonably rejected Dr. Slack's opinion that Plaintiff cannot lift any amount at all and can sit, stand, and walk for less than 2 hours in an 8-hour workday.  (R. 31, 313-14).  Plaintiff says that since the State agency doctors gave no opinion about her functioning, the ALJ was left with an evidentiary deficit that she improperly filled with her own lay opinion.  (Doc. 15, at 8; Doc. 26, at 3, 12).  To begin, Plaintiff is entirely responsible for the absence of any State agency opinions because she failed to show up to any of the four consultative examinations the agency scheduled for her.  (R. 29, 30).  Though she returned letters to the agency confirming her responsibility to attend the exams, she testified at the administrative hearing that she was unaware of them.[3]  (R. 29, 103-04).  This alone seriously undermines Plaintiff's objection to the ALJ's RFC determination.  *See* 20 C.F.R. § 404.1518(a) ("If you are applying for benefits and do not have a good reason for failing or refusing to take part in a consultative examination or test which we arrange for you to get information we need to determine your disability .

---

[3]     After Plaintiff missed her first two consultative exams, the agency contacted Plaintiff's attorney to reschedule at the location requested by counsel.  The agency called and left a message at the attorney's office with a reminder about the need for Plaintiff to appear at the rescheduled exams, but she did not show or provide a good reason why she unable to attend.  (R. 104-05).

. ., we may find that you are not disabled."); *Eichstadt v. Astrue*, 534 F.3d 663, 668 (7th Cir. 2008) ("The claimant bears the burden of producing medical evidence that supports her claims of disability. That means that the claimant bears the risk of uncertainty . . .").

More importantly, the extensive objective evidence detailed in the previous section fairly supports the ALJ's conclusion that Plaintiff can perform light work.  The ALJ acknowledged that after Plaintiff's surgeries in 2012, she complained of neck and back pain, exhibited tenderness and decreased range of motion, and presented with an unsteady gait on several occasions.  But the ALJ also concluded that clinical findings routinely showed at most moderate abnormalities.  (R. 29)  For example, a June 19, 2012 MRI of the cervical spine showed no evidence of significant central spinal stenosis or neural foraminal narrowing (R. 626-27); a September 1, 2012 CT scan of the neck showed no enhancing abnormalities following Chiari malformation repair (R. 334); a December 18, 2012 MRI of the cervical spine showed no evidence of significant spinal stenosis or neural foraminal narrowing (R. 336); a July 3, 2014 MRI of the lumbar spine showed degenerative changes most prominent at L5-S1 and small disc protrusion at S1 (357-58); and an October 17, 2014 MRI of the cervical spine showed spondylosis at C3-C6 and a 2mm posterior central protrusion at C6-C7.  (389-90).

Plaintiff does not explain how these records evidence severely impaired functioning that prevents her from engaging in light work.  Instead she offers the same recitation of her various diagnoses, treatment notes from before her 2012 surgeries, and opinions from Dr. Slack and Dr. Heffez that the ALJ properly addressed and discounted. (Doc. 15, at 13; Doc. 26, at 11-12)  Plaintiff also ignores the fact that: she failed to follow Dr. Slack's recommendation for epidural steroid injections and opted for conservative

medication management; she never met with a pain specialist or neurosurgeon as Dr. Slack suggested; she went three years without seeing her rheumatologist Dr. Siegel and never saw her again after November 24, 2014; she went more than three years from January 2015 until April 2018 without seeing her internist Dr. Farby; and she has not seen her orthopedist Dr. Slack since July 2016.  (R. 28-29).

Plaintiff insists the ALJ at least should have included some range of motion restrictions in the RFC given her complaints of neck and back pain.  (R. Doc. 15, at 13). The ALJ did exactly that when she limited Plaintiff to only occasional stooping, crawling, crouching, kneeling, and climbing of stairs and ramps, and no climbing of ladders, ropes and scaffolds.  (R. 21).  Aside from Dr. Slack's opinion, Plaintiff does not identify any other records that support additional restrictions.  Since the ALJ reasonably rejected Dr. Slack's extreme range of motion limitations, there is no merit to Plaintiff's argument that the ALJ erred by not including them in the hypothetical questions she posed to the VE.  (Doc. 15, at 9-10).  *See Karen D. v. Saul*, No. 1:19-CV-00871-TWP-TAB, 2020 WL 2489538, at *3 (S.D. Ind. May 14, 2020) (citing *Simila*, 573 F.3d at 521) ("[T]he ALJ need incorporate into hypotheticals only the impairments and limitations that [s]he finds credible.").

Absent compelling medical evidence demonstrating she cannot perform light work, Plaintiff relies on her own statements to that effect.  The regulations describe a two-step process for evaluating a claimant's own description of her impairments.  First, the ALJ "must consider whether there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce the individual's symptoms, such as pain."  SSR 16-3p, at *2.  If there is such an impairment, the ALJ must "evaluate the intensity and persistence of those symptoms to determine the extent to which the

symptoms limit an individual's ability to perform work-related activities." *Id*. In evaluating a claimant's symptoms, "an ALJ must consider several factors, including the claimant's daily activities, her level of pain or symptoms, aggravating factors, medication, treatment, and limitations, . . . and justify the finding with specific reasons." *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009).

The Court is to give the ALJ's assessment of a claimant's subjective symptom allegations "special deference and will overturn it only if it is patently wrong," i.e., if it "lacks any explanation or support." *Summers v. Berryhill*, 864 F.3d 523, 528 (7th Cir. 2017) (internal quotations omitted); *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). A reviewing court should rarely disturb a subjective symptom assessment, as it lacks "the opportunity to observe the claimant testifying." *Sims v. Barnhart*, 442 F.3d 536, 538 (7th Cir. 2006). The claimant bears the burden of showing that an ALJ's subjective symptom evaluation is "patently wrong." *See Horr v. Berryhill*, 743 F. App'x 16, 20 (7th Cir. 2018).

Plaintiff testified that she has pain in her neck and shoulders that shoots down to either or both arms, and she has no feeling in the hands aside from the fingertips. She also experiences pain shooting from her back down into her legs and feet, as well as severe nerve and bone pain. (R. 55-56). During the day, Plaintiff lays on the floor and puts her feet up against the wall or rolls on a ball to stretch. (R. 65). Plaintiff stated that with respect to her feet, she feels either nothing at all or needles, and complained of swelling in the feet and in the hands and knees. (R. 55-56). She estimated that she can only walk a block, cannot stand for even one second without falling over, can sit for half an hour before needing to get up and move around, and can lift 5 pounds. (R. 57).

In rejecting this testimony, the ALJ first noted that though Plaintiff complained of disabling symptoms, she had not received "the type of medical treatment one would expect for a totally disabled individual." (R. 28). Plaintiff objects that the ALJ was not qualified to determine what treatment would be appropriate for her. (Doc. 15, at 15; Doc. 26, at 16). As discussed, however, there were large gaps in Plaintiff's treatment history and she repeatedly failed to follow her doctors' recommended course of care. (R. 22, 28, 30). Though Plaintiff's mother scheduled neurology and testing appointments for her daughter, Plaintiff canceled them. (R. 23). The only explanations Plaintiff offered for these lapses was that she has a morbid fear of hospitals, she does not trust new doctors, and "[w]hen you keep getting diagnosed with things over and over again and they keep finding more and more things wrong with you, you don't want to see doctors." (R. 52-53, 607). The ALJ fairly concluded that these are not good reasons for forgoing treatment and greatly undermine Plaintiff's assertions of disabling symptoms. *See Craft*, 539 F.3d at 679 ("In assessing credibility, infrequent treatment or failure to follow a treatment plan can support an adverse credibility finding where the claimant does not have a good reason for the failure or infrequency of treatment."); *Brenda L. v. Saul*, 392 F. Supp. 3d 858, 870 (N.D. Ill. 2019).

The ALJ also noted that Plaintiff's complaints of disabling symptoms were inconsistent with the medical record. For example, Plaintiff complained of numbness in her hands and feet, but there were no nerve or sensory deficits noted during examinations with Dr. Farby on September 4, 2013, January 9, 2015, and April 20, 2018. (R. 29, 591, 594, 606). In addition, though Plaintiff purportedly cannot stand without falling over, she has never used or been prescribed an assistive device. (R. 30).

Another reason the ALJ gave for rejecting Plaintiff's statements was their inconsistency with her activities of daily living. Though Plaintiff testified she cannot stand for one second without falling over or lift more than 5 pounds, she lives by herself, cares for five unadoptable dogs, can groom one dog per day using dry shampoo and conditioner, can do laundry (though she cannot carry it up and down the stairs), can do some cleaning around the house, can bathe and dress herself independently, can fix simple meals, can drive short distances, and can shop online. (R. 20, 22, 30, 57, 58, 226-27). The ALJ recognized that Plaintiff's parents assist her with the dogs, do her grocery shopping, load the dishwasher, carry laundry up and down the stairs, and take out the garbage.[4] (R. 22, 70). Nevertheless, the parents do not see Plaintiff every day, and the ALJ reasonably concluded that her ability to live on her own and care for herself and five dogs undermines her claim that she is essentially unable to stand, use her hands, or function. *See Hackel v. Colvin*, No. 14 C 1429, 2016 WL 707020, at *15 (E.D. Wis. Feb. 22, 2016) ("[I]t is proper for the ALJ to consider a claimant's activities of daily living in assessing [the limiting effects of her symptoms] because inconsistencies between activities of daily living and the claimant's self-reported limitations may suggest that a claimant's testimony regarding her symptoms are exaggerated."). Contrary to Plaintiff's assertion, the ALJ did not equate these activities of daily living with an ability to work; they were simply one factor weighing against the reliability of Plaintiff's statements.

---

[4]     In light of evidence that Plaintiff's parents routinely help her, there is no merit to her speculation that she performed certain activities of daily living only "because it was unlikely she had someone to do that for her." (Doc. 26, at 8). *Compare Hughes v. Astrue*, 705 F.3d 276, 279 (7th Cir. 2013) (ALJ erred in discounting the plaintiff's claims of disabling symptoms based on her ability to perform certain activities of daily living without considering that she "has no one" to help her).

The ALJ further discounted Plaintiff's statements because she "appeared rather histrionic" at the hearing and was "evasive" and refused to answer several questions." (R. 29). *See Olsen v. Colvin*, 551 F. App'x 868, 875 (7th Cir. 2014) (in evaluating the plaintiff's subjective statements it is "appropriate for the ALJ to consider her actions during the administrative hearing."). Plaintiff responds by faulting the ALJ for not specifically mentioning her testimony that she needs to lie down and stretch throughout the day. (R. 51). But no physician of record endorsed such a restriction besides Dr. Slack. The ALJ provided enough valid reasons for discounting Plaintiff's complaints that her pain is so disabling as to prevent her from performing light work, and this aspect of the ALJ's decision was not patently wrong. *Dawson v. Colvin*, No. 11 C 6671, 2014 WL 1392974, at *10 (N.D. Ill. Apr. 10, 2014) (citing *Schreiber v. Colvin*, 519 F. App'x 951, 961 (7th Cir. 2013)) (an ALJ's credibility assessment "need not be perfect; it just can't be patently wrong.").

Viewing the record as a whole, the ALJ's determination that Plaintiff has the physical RFC for light work is supported by substantial evidence. The case need not be remanded for further consideration of this issue.

### 3. Mental RFC

Plaintiff argues that even if the physical RFC is supported by substantial evidence, the ALJ made a flawed mental RFC assessment that warrants reversal or remand. According to Plaintiff, the ALJ found her moderately limited in her ability to concentrate, persist, and maintain pace. Though the ALJ accounted for the concentration problems by limiting Plaintiff to "simple and detailed, 1-5 step instructions" (R. 21), the ALJ failed to address her limitations in persistence and pace. Plaintiff says this resulted in an

incomplete hypothetical question to the VE and was not harmless because the VE testified that if Plaintiff were off-task for more than 15% of the workday, she would not be able to engage in competitive work.  (Doc. 15, at 10-11; Doc. 26, at 14-15).  The Court does not find this argument persuasive.

Plaintiff does not dispute the ALJ's determination that she has no severe mental impairment.  (R. 18, 29-30).  Nor does she deny that the record contains no mental health records of any kind.  And mini-mental status exams conducted by Dr. Farby were routinely unremarkable, with normal mood, affect, cognition, and memory.  (R. 18, 20, 544, 591, 594, 597, 600, 602, 604, 606, 608).  At step two of the sequential analysis, the ALJ found that Plaintiff generally has a mild limitation in concentration, persistence, or pace, but the limitation becomes moderate "when considering [Plaintiff's] allegations of pain and possible medication side effects."  (R. 19).  Elsewhere in the decision, the ALJ clarified that the moderate limitation concerns only concentration:  (1) "[t]he undersigned finds that when these two factors [pain and possible medication side effects] are considered, they would adversely affect [Plaintiff's] ability to concentrate" (R. 20); (2) Plaintiff is limited to "simple and detailed, 1-5 step instructions due to decreased concentration from allegations of pain and possible medication side effects" (R. 21); and (3) "[d]ue to allegation[s] of pain and possible medication side effects, the undersigned is limiting [Plaintiff's] concentration by adding no complex tasks to the [RFC]."  (R. 30).  *See Buckhanon ex rel. J.H. v. Astrue*, 368 F. App'x 674, 678-79 (7th Cir. 2010) ("[W]e read the ALJ's decision as a whole and with common sense.").

Plaintiff disagrees with the ALJ's assessment but she cannot point to any mental health professional who imposed greater restrictions.  It appears that Plaintiff saw a

therapist at some point in the past, but those treatment notes are not in the record and Plaintiff did not seek further mental care after the therapist died. (R. 28). The ALJ acknowledged that Plaintiff was very attached to the deceased therapist, and noted Plaintiff's puzzling explanation that she could not see a new therapist without first obtaining her past mental health records. (R. 22). Once again, however, these are not good reasons for forgoing medical treatment. As the ALJ noted, moreover, since Plaintiff failed to appear for her scheduled consultative examinations, she "lost the opportunity to have her mental condition assessed by mental health specialists." (R. 30). This fact easily disposes of Plaintiff's suggestion that the ALJ should have scheduled yet another consultative examination or obtained testimony from a psychiatric medical expert. (Doc. 15, at 12). *See Heather F. v. Kijakazi*, No. 1:20-CV-02968-JMS-MG, 2022 WL 58436, at *8 (S.D. Ind. Jan. 6, 2022) ("The ALJ was not required to call a medical expert unless there was insufficient evidence to make an informed decision.").

The ALJ also properly incorporated the limitation to no complex tasks in the hypothetical question posed to the VE, and accepted the VE's testimony that a person with such a restriction and Plaintiff's education and background could work as a marker, housekeeping cleaner, and mail clerk. (R. 32, 78-79). Plaintiff does not challenge this aspect of the ALJ's decision but argues that the ALJ erred in failing to discuss evidence that she would be off-task for more than 15% of the workday. (Doc. 15, at 12). In Plaintiff's view, once the ALJ determined that she had a moderate limitation in the ability to concentrate, she "was obligated to address the [VE's] testimony on off-task time" in her decision. (*Id.*) (citing *Kukec v. Berryhill*, No. 16 C 9805, 2017 WL 5191872, at *3-4 (N.D. Ill. Nov. 9, 2017) and *Crump v. Saul*, 932 F.3d 567, 570 (7th Cir. 2019)). First, aside from

her orthopedist Dr. Slack (whose opinion fairly received little weight), Plaintiff does not identify any physician of record who found that she actually would be off-task for more than 15% of the workday.  In addition, the cases Plaintiff relies on are distinguishable.  In both *Kukec* and *Crump*, the ALJ specifically asked the VE about a hypothetical person who would be off task 20% of the time.  2017 WL 5191872, at *3; 932 F.3d at 570.  Here, it was Plaintiff's counsel who asked the VE about off-task time, not the ALJ.  (R. 81).  In such circumstances, the ALJ did not commit reversible error by failing to specifically address the issue of off-task time in her decision.

On the record presented, the ALJ's decision to limit Plaintiff to simple and detailed, 1-5 step instructions to accommodate decreased concentration stemming from pain and possible medication side effects is supported by substantial evidence.

### 4.    Headaches

Plaintiff finally argues the case must be reversed or remanded so the ALJ can determine the exact frequency and duration of her headaches.  (Doc. 15, at 14; Doc. 26, at 13-14).  Plaintiff claims to have 10 migraines each month lasting as long as 5 days, and says that when a migraine occurs, she cannot do anything but lay still.  (R. 64-65).  Yet records show that after Plaintiff's Chiari malformation surgeries in 2012, she only mentioned headaches to her treaters two more times from 2013 forward:  once to Dr. Farby on February 3, 2014; and once to Dr. Slack on September 3, 2014.  (R. 29, 542, 599).  In addition, neurologist Prasad Chappidi, M.D., described Plaintiff as "a poor historian regarding frequency of headaches."  (R. 29, 621).  Moreover, Dr. Farby characterized Plaintiff's headaches as clinically stable in January 2015 (R. 593), after which she required no further treatment for a year and a half.  The ALJ fairly concluded

that this was inconsistent with Plaintiff's claims of debilitating, days-long headaches 10 times per month.

It is true that Plaintiff's mother testified that her daughter's headaches are "pretty severe" (R. 22), but she said nothing about the frequency or duration of those episodes aside from noting that they "usually come along with a lot of precipitation." (R. 72). Based on this evidence, the ALJ did not err in rejecting Plaintiff's testimony regarding the frequency, duration, and limiting effects of her headaches. And since no physician of record (including Dr. Slack) indicated that Plaintiff's headaches impact her ability to work, the ALJ's decision not to impose any related functional restrictions in the RFC is supported by substantial evidence. "As the Supreme Court observed fairly recently, substantial evidence is not a high standard, and requires only evidence that 'a reasonable mind might accept as adequate.'" *Richard C. v. Saul*, No. 19 C 50013, 2020 WL 1139244, at *5 (N.D. Ill. Mar. 9, 2020) (quoting *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019)).

Viewing the record as a whole, the ALJ did not err in her assessment of Plaintiff's headaches and there is no basis to remand the case for further consideration of this issue.

<u>**CONCLUSION**</u>

For the reasons stated above, Plaintiff's request to reverse or remand the ALJ's decision is denied, and the Commissioner's Motion for Summary Judgment [22] is granted. The Clerk is directed to enter judgment in favor of the Commissioner.

ENTER:

_Sheila Finnegan_

Dated: February 8, 2022

_____
SHEILA FINNEGAN
United States Magistrate Judge